OPINION
{¶ 1} Defendant-appellant Leroy Charley, Jr. appeals from his conviction of aggravated murder entered in the Belmont County Common Pleas Court. He presents issues regarding probable cause for his arrest, other acts evidence, exclusion of a DNA report, a witness's mention of offering to take a polygraph, sufficiency of the evidence and weight of the evidence. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} At noon on May 25, 2003, the body of forty-two-year-old Sue Forbes was discovered in her bed in her home in Martins Ferry, Ohio. She had been beaten, bitten, strangled and stabbed twenty times in the chest. Her shirt had been raised in an exposing manner, and her zipper was down. Responding officers were immediately informed that the victim was last seen at half-past midnight outside her home with appellant. Appellant and the victim had been dropped off by the victim's cousin, who heard them arguing and observed that appellant had to assist the seemingly intoxicated victim to her house. The victim had previously been dating appellant; however, when she broke off the relationship, he continued to pursue her.
 {¶ 3} Based upon information gathered from the victim's relatives, the Martins Ferry Police Department immediately asked the Wheeling Police Department in West Virginia to detain appellant for questioning in a homicide while the process for obtaining an arrest warrant was put in motion. The Wheeling police found appellant sleeping at his parent's house. He agreed to accompany them to the station for questioning by Martins Ferry police. Thereafter, an arrest warrant was faxed to the station in Wheeling, and appellant was arrested for murder at that time.
 {¶ 4} Due to a high bond, appellant remained incarcerated. At a June 17, 2003 hearing on the state's request for a DNA sample, a blood sample and dental impressions, the court advised that the state must seek a search warrant for such evidence. The defense indicated a willingness to consent to such evidence gathering in exchange for the state's consent to a reduction of bond to $40,000. The state was *Page 3 
willing to agree since speedy trial time was running at triple time while appellant remained incarcerated and since it would take some time for DNA test results to be returned. Appellant submitted to the evidence gathering at that time.
 {¶ 5} However, he still failed to make bail. Thereafter, on July 18, 2003, the state dismissed the murder charge without prejudice. Then, on February 5, 2004, appellant was indicted for aggravated murder in violation of R.C. 2903.01(A). It was alleged that he purposely caused the death of Sue Forbes with prior calculation and design.
 {¶ 6} Appellant filed a motion to suppress the samples and dental impressions. He alleged that his arrest was illegal in main part because it was not based upon probable cause. He concluded that he only gave consent to the evidence gathering because he was incarcerated and he was only incarcerated because of an arrest that lacked probable cause. Thus, he urged that his consensually granted samples were the fruit of the poisonous tree. A suppression hearing was held on May 19, 2004, where testimony was presented by the Martins Ferry Police Chief and one of his officers. The court subsequently denied the motion to suppress.
 {¶ 7} Appellant also filed a motion to disclose any intent to use prior bad acts evidence. The state gave notice that it intended to present certain testimony regarding appellant's behavior upon being rejected by past female paramours. A hearing on appellant's motion in limine regarding such evidence was held on September 14, 2005. The court overruled the motion in limine, noting that appellant presented many good arguments that would be useful at trial.
 {¶ 8} The jury trial began on September 23, 2005. Testimony was presented that the victim began dating appellant in October 2002, but she tried to end the relationship in early 2003. Appellant, however, still pursued her. For instance, he repeatedly telephoned her. (Tr. 338-343). In one phone call, he was heard telling the victim that he was watching her and could see her in the kitchen. (Tr. 153). Because she eventually refused to answer when she saw he was calling, he resorted to dialing *67 before dialing her number to block her caller identification device. (Tr. 339-342, 346). Testimony established that appellant sent the victim flowers and appeared uninvited at her home and work. (Tr. 228, 455-457). He bothered her friends and *Page 4 
relatives, asking why she rejected him. (Tr. 95, 144, 181). He had also started a confrontation in the past by following her when she went out. (Tr. 152-153).
 {¶ 9} Testimony was presented that on the evening of May 24, 2003, the victim's cousin and sister arrived at the victim's house. Appellant was alone in her kitchen. He disclosed that the victim did not want him there. (Tr. 142). When the three women exited and walked to the car, appellant followed. The victim made it clear that appellant was not welcome; however, he went along anyway. (Tr. 97). The victim refused to sit in the back seat with him. (Tr. 97, 145).
 {¶ 10} They drove to a nearby bar where appellant purchased the drinks and personally handed each woman her drink. Early in the night, the victim asked her cousin to accompany her to the bathroom, where she left her bottled beer after revealing that it tasted funny. (Tr. 99). When appellant realized that the victim had abandoned her beer, he inquired about it and seemed angry. (Tr. 100). Appellant was later heard trying to talk the victim into doing shots. She initially refused, and each time he brought her one, she would seem to spill it on purpose. She finally drank one shot upon his repeated prompting. (Tr. 234). Then, the victim suddenly became seriously impaired. (Tr. 100, 146, 234).
 {¶ 11} Sometime estimated at between 11:00 p.m. and close to the time they were getting ready to leave, the victim ate from a cheese tray. (Tr. 100-101, 147, 670-672). They left the bar near midnight and then stopped at another local bar. (Tr. 101, 243). Appellant stayed in the car and advised that he and the victim would be in soon. When that did not occur, the victim's cousin called appellant's cellular phone around 12:30 a.m. to see if they were coming in, at which point appellant disclosed that the victim was passed out and wanted to go home. (Tr. 103). However, he had just told the victim's son that she would not be home until later. (Tr. 172, 175).
 {¶ 12} The victim's cousin immediately returned to the car and brought the victim home. When appellant assisted the victim from the car, she partially regained her senses. She asked her cousin to tell appellant to leave her alone. (Tr. 105). Appellant assured the cousin that he would take care of the victim. He then assisted or half-carried the victim as she stumbled toward her house. *Page 5 
 {¶ 13} The coroner testified that the victim died no more than two hours after eating cheese cubes based upon her stomach contents, but noted that typically at two hours, the cubes would be more unrecognizable than the ones he found. (Tr. 396-398). The victim had been beaten, strangled incompletely and stabbed twenty times. (Tr. 289, 359-364, 375, 399). She was also bitten twice on the abdomen near the time of death. (Tr. 293, 366). One of the bite marks was concluded by the state's expert to match appellant's dental impressions. (Tr. 554). The other bite was said to be insufficient for comparison purposes. (Tr. 553). Appellant's DNA was discovered in both bite marks. (Tr. 522-523, 723-724).
 {¶ 14} The victim's blood alcohol content was .27 at the time of death. (Tr. 382). Moreover, her blood contained seven to eight times the maximum therapeutic dose of Flexeril, a muscle relaxant and pain reliever. (Tr. 382-383). Until May 7, 2003, appellant lived with a woman who took Flexeril. She left him because of his relationship with the victim. When this woman returned on May 10 to pick up her belongings, appellant instructed her to just give him two weeks longer. He stated that she would read about it in the paper and then he would be all hers in two weeks. (Tr. 440). Coincidentally, the victim was murdered two weeks later.
 {¶ 15} Finally, the state presented the testimony of a woman whom appellant had dated intermittently over the years. After hearing about his arrest, she visited appellant in jail and believed in his innocence. She dated him after he was initially released. However, in early 2004, he admitted to her that he killed the victim during a crying confession entailing some details and an opinion that they would not find the disposed of evidence. (Tr. 592). This woman then feared appellant and tried to extricate herself from their relationship. She did not approach the police with this information. Rather, they found her through a friend in whom she confided. (Tr. 597).
 {¶ 16} On October 5, 2005, the jury returned a verdict finding appellant guilty of aggravated murder. On October 12, 2005, he was sentenced to life in prison with possibility of parole after serving twenty years. He filed timely notice of appeal. He also filed a motion for new trial with five grounds, corresponding to the five assignments of error in this appeal. *Page 6 
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 17} Appellant's first assignment of error contends:
 {¶ 18} "THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS DEFENDANT'S DNA SAMPLES WHICH WERE OBTAINED AFTER HIS ILLEGAL ARREST AND IN EXCHANGE FOR A BOND REDUCTION."
 {¶ 19} Appellant claims that the warrantless entry into his parents' dwelling to make a warrantless arrest of their guest was not valid without his consent, notwithstanding the consent of the homeowners. SeeMinnesota v. Olson (1990), 495 U.S. 91, 99. He concludes that he could not have given such consent to enter because he was sleeping. Although appellant agreed to accompany the Wheeling police to the station for questioning by Martins Ferry police, he characterizes his transportation to the station as an arrest. He complains about this warrantless "arrest" and the subsequent detention for over two hours until a warrant was issued. He admits that one can be arrested without a warrant if there is probable cause to believe a felony was committed. However, he disputes that there was probable cause to so believe at the time of his arrest.
 {¶ 20} Regardless of appellant's initial arguments, no evidence was gathered as a result of the entry into his parents' home or during his time spent in the station. He was not questioned in any manner by the Wheeling Police. In fact, the only evidence sought to be suppressed here are the samples given two months after his arrest in exchange for reduced bail. He states that he would not have consented to the sampling if he were not being illegally held without probable cause and that contrary to the state's contention, no search warrant would have inevitably issued for his samples if such probable cause was lacking.
 {¶ 21} If he was properly being held at the time of his consent, then the other issues he raises are irrelevant. Consequently, the ultimate issue here is whether appellant was being validly held. We thus proceed to evaluate the evidence presented at the suppression hearing to determine whether the police had probable cause to believe that appellant caused the victim's death.
 {¶ 22} In determining whether the police had probable cause to arrest a suspect, the court must ascertain whether the police had sufficient information, derived *Page 7 
from a reasonably trustworthy source, sufficient to cause a prudent person to believe that the suspect committed the crime for which he is being arrested. State v. Timson (1974), 38 Ohio St.2d 122, 127 (also noting that R.C. 2935.40 allows a warrantless arrest if the officer has reasonable grounds to believe that a felony has been committed by the arrestee). The court must view the totality of the facts and circumstances along with the reasonable inferences that can be drawn therefrom. See State v. Homan (2000), 89 Ohio St.3d 421, 427. The weight of the evidence and the credibility of witnesses at the suppression hearing are issues primarily for the province of the trial court.State v. DePew (1988), 38 Ohio St.3d 275, 277.
 {¶ 23} First, we note that the police gathered information from average and identified citizens. See State v. Otte (1996),74 Ohio St.3d 555, 559. In fact, they were related to the victim. See State v.Woodards (1966), 6 Ohio St.2d 14, 20-21. The information providers were not anonymous tipsters or criminal informants. See Maumee v.Weisner (1999), 87 Ohio St.3d 295, 300 (noting the three main types of informants and explaining their varying levels of trustworthiness). The stories related were consistent and of the same character regarding the problems the victim was having with appellant. Thus, the police possessed a reasonably trustworthy source of information. SeeOtte, supra. See, also, Crim.R. 4(A)(1) (which permits hearsay to support a finding of probable cause for an arrest warrant).
 {¶ 24} Whether the content of the information provided by the sources established probable cause to arrest appellant for causing the victim's death is the next question. Prior to appellant's arrest, the police had viewed the body of a victim who had been violently murdered in her own bed in the middle of the night while still dressed. The police could see that she had multiple stab wounds. (Tr. 38). The police chief stated that he had been informed that the victim was last seen with appellant around 1:00 a.m. when they were both dropped off at the victim's home. (Tr. 39, 50). He testified that he was advised that the victim was incoherent and that appellant was approaching her residence with her while bodily helping her walk. (Tr. 50). The chief also said he was informed that the victim and appellant were dating. (Tr. 39). *Page 8 
 {¶ 25} The first officer on the scene testified that he secured the crime scene and then spoke to the victim's family, including her adult daughter, teenage son, sister and cousin. He was informed of the following facts: the victim had been dating appellant, but they were not getting along; he sent her flowers at work and stopped by uninvited; the victim was in the process of trying to distance herself from him, but he would not leave her alone; the victim's cousin dropped them off less than twelve hours before; and, they were arguing because the victim did not want appellant at her house, but he was bodily helping her toward the house. (Tr. 50-54). This officer testified that he related all of this information to his chief before the chief called West Virginia or sought an arrest warrant. (Tr. 55-57).
 {¶ 26} Contrary to appellant's suggestion, it is not merely the fact that he was the last person seen with the victim that caused his arrest. Rather, it is that fact combined with others. For instance, there is the fact that the victim repeatedly attempted to distance herself from him. There is his accompanying refusal to acknowledge her wishes, including her wishes that he not approach her house that night, and the argument that ensued. See Woodards, 6 Ohio St.2d at 20-21 (finding probable cause to arrest defendant for causing victim's death where there were no signs of forced entry, the offense was violent in nature, the defendant was known to the victim, he had a prior record and he was known to have a violent temper). Although probable cause must be more than a mere suspicion, it need not come anywhere near the amount of evidence required to sustain a conviction.
 {¶ 27} Considering all of the facts and circumstances herein, including all rational inferences that can be drawn therefrom, the trial court was warranted in concluding that a prudent person could believe that appellant caused the victim's death. The fact that the state dismissed the initial murder charge on July 18, 2003, although curious (and seemingly due to speedy trial issues and the delay in the state lab's DNA testing rather than due to insufficient evidence to present to a grand jury), does not detract from the finding of probable cause prior thereto.
 {¶ 28} We also note that an arrest warrant was issued during his detention, which would further uphold his incarceration at the time of the sampling. See State v. Tibbetts (2001), 92 Ohio St.3d 146, 153 (the trial court conducting a suppression *Page 9 
hearing and the later appellate courts need only determine whether magistrate had a substantial basis for finding probable cause to issue warrant), citing State v. George (1989), 45 Ohio St.3d 325, 329 (must be only substantial basis for concluding there was a fair probability of the fact sought to be established as courts have preference for upholding warrants). For all of the foregoing reasons, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 29} Appellant's second assignment of error alleges:
 {¶ 30} "THE TRIAL COURT ERRED IN ADMITTING 404(b) EVIDENCE RELATING TO DEFENDANT'S FORMER RELATIONSHIPS."
 {¶ 31} Appellant filed a motion in limine to exclude other acts evidence concerning violence or stalking against his former wife and girlfriends. A hearing was held on the matter on September 14, 2005, over a week before the trial started. There the defense argued that the evidence is not relevant and was not sufficiently similar with the current offense because the witnesses are still alive, but the victim here is deceased. (Tr. 3, 4). The defense concluded that the evidence was overly prejudicial and not probative of the issues here. (Tr. 4). The court overruled the motion in limine. However, the court noted that many of the points raised by the defense were good arguments and would be useful at trial. (Tr. 7-8).
 {¶ 32} Appellant now takes issue with the following other acts evidence presented at trial. First, Lona Charley, appellant's former wife, testified that when she tried to leave appellant, he basically locked her in the house for the weekend. (Tr. 83). Ms. Charley revealed that appellant once choked her until she nearly passed out and that he struck her in the head with a closed pocket knife. (Tr. 84, 86). She also disclosed that she had a restraining order against him during their divorce. (Tr. 87).
 {¶ 33} Appellant's former girlfriend, Latonna Garrison, testified that appellant threw her across a room and blocked her car in when she revealed that she was leaving him. (Tr. 428). (This is the witness who left appellant due to his relationship with the victim and whom appellant asked to give him two weeks longer with the victim. (Tr. 440).) *Page 10 
 {¶ 34} Another former girlfriend, Steffie Smith, testified that she began dating appellant after he was released from jail. This is the witness to whom appellant confessed the murder. (Tr. 592). She advised him that she wanted to break it off and then dropped him off at his parents' house. However, he refused to exit her car for hours. Because she was scared, she had appellant's mother take her home. (Tr. 595). The next day, when she further rejected him, appellant's father came to warn her to leave her house because appellant was coming. (Tr. 596). Appellant claims that the above testimony is not relevant and must be excluded as being unfairly prejudicial under Evid.R. 403(A). He also alleges that the testimony constitutes inadmissible other acts evidence under Evid.R. 404(B).
 {¶ 35} Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. Evidence which is not relevant is not admissible. Evid.R. 402. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). Character evidence is generally not admissible to show propensity:
 {¶ 36} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).
 {¶ 37} A companion statute to the rule provides:
 {¶ 38} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." R.C. 2945.59. *Page 11 
 {¶ 39} If there is substantial proof the other acts were committed by the defendant and if the evidence of other acts "tends to prove" one of the exceptions, then it is admissible. State v. Lowe (1994),69 Ohio St.3d 527, 529. In the case at bar, the witnesses' testimony provided substantial proof that the other acts were committed by appellant. Accordingly, the issue here is essentially whether the other acts evidence "tends to prove" motive, identity, or a scheme or system.
 {¶ 40} Appellant urges that the identity exception, which is considered the least precise exception, is inapplicable because neither of the identity exception's two facets exists here. First, he states that the other acts are not inextricably intertwined with the background of this offense. See id. at 531. Second, he claims that they do not establish a behavioral fingerprint or modus operandi. See id.
 {¶ 41} In Lowe, the Supreme Court held that to be admissible, the acts must establish the identity of the perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan or system was used in the commission of the charged offense. Id. The Court then concluded that other acts evidence of displaying pornography to young girls did not tend to prove identity in a trial for a non-sexually motivated murder. Id. Appellant finds his case comparable to Lowe.
 {¶ 42} However, the similarity of the other acts evidence here with appellant's conduct leading up to the victim's murder is much greater than the similarity of the other acts evidence in Lowe. Moreover,Lowe was a state's appeal from a trial court's decision to exclude the other acts evidence. The Lowe Court affirmed the trial court's exclusion, emphasizing that the trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, the reviewing court should be slow to interfere. Id. at 532, citing State v.Maurer (1984), 15 Ohio St.3d 239, 265. Here, upholding the discretionary decision of the trial court would work the opposite direction.
 {¶ 43} In responding to the motion in limine, the state pointed to a case where the defendant was accused of strangling a woman to death. In that case, the state offered testimony from two women who said that the defendant had choked them during arguments. The Eighth District held that this fell under the other acts exception *Page 12 
of identity as modus operandi. State v. Collymore, 8th Dist. No. 81594, 2003-Ohio-3328, ¶ 44. Here, appellant was alleged to have choked his former wife causing her to start to lose consciousness, and he was alleged to have partially strangled the murder victim. The state thus argues that the similarity is adequate for purposes of the identity exception.
 {¶ 44} In any event, appellant's argument against identity overlooks the motive exception. As the state points out, the Supreme Court has allowed, in a kidnapping trial, testimony from a girlfriend who testified that the defendant threatened to hit her when she rejected him. State v. Wilson (1996), 74 Ohio St.3d 381, 390. The Court noted that the state argued in part that his motive for kidnapping the victim was his inability to deal with female rejection. Id.
 {¶ 45} Here, revealing the other acts evidence established appellant's inability to accept rejection in his female relationships and was relevant to his motive for killing the victim herein. Contrary to appellant's contention, the fact that the other females are still alive but the victim here is dead is not the threshold or determinative issue. See id.
 {¶ 46} Moreover, the prejudicial effect of the other acts testimony is not substantially outweighed by the probative value under the facts and circumstances existing herein. See Evid.R. 403(A). "Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant." State v. Skatzes, 104 Ohio St.3d 195,2004-Ohio-6391, ¶ 107. Appellant claims that unfair prejudice is apparent due to the lack of forensic evidence. However, this contention disregards the testimony that appellant's DNA was found in both bite marks.
 {¶ 47} Additionally, there is much other evidence of his guilt. This other evidence includes the fact that his dental impressions were found to match one of those bite marks. Also, there was testimony that he had been nearly stalking the victim and refusing to accept her rejection of him. In fact, testimony established that she rejected him before they went out that night. Other testimony allowed the reasonable inference that appellant drugged her drinks causing her suddenly semiconscious state. Additionally, she came out of her drug-induced stupor at the end of the night long enough to beg that he not be permitted to escort her into her home. *Page 13 
Finally, he expressly confessed the murder to his girlfriend disclosing details matching those found at the scene. Any prejudicial effect is diminished by this other overwhelming evidence.
 {¶ 48} Regardless of any of the above analysis, appellant failed to object to the admission of these three witnesses' testimony on other acts evidence at trial. Appellant claims that he preserved his objections at the motion in limine hearing on September 14, 2005. He supports his contention with the following quote:
 {¶ 49} "As related to trial, a motion in limine is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." State v. Grubb (1986), 28 Ohio St. 3d 199, 201, quoting State v. Spahr (1976), 47 Ohio App.2d 221.
 {¶ 50} First, we note that this statement is a quote from an appellate court, which the Supreme Court set forth immediately after noting that the motion in limine "is frequently misused and misunderstood." Id. Second, reliance on that quote to support the argument that the objection need not be made at trial ignores the remainder of theGrubb opinion. For instance, the Court then quoted a commentator as follows:
 {¶ 51} "The sustaining of a motion in limine does not determine the admissibility of the evidence to which it is directed. Rather it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible." Id.
 {¶ 52} Then, the Grubb Court specified that the ruling on a motion inlimine is preliminary, tentative, temporary and anticipatory treatmentof the issue to be later resolved when it arises in the context of thetrial where the trial court may change its mind based upon circumstancesthat develop. Id. at 201-203. The Court also cited Evid.R. 103(A)(1) and pointed to a holding explaining that the failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion in limine. Id. at 203.
 {¶ 53} Furthermore, later Supreme Court holdings have reiterated the principle that a motion in limine does not preserve the issue for purposes of trial or appeal. *Page 14 State v. Hill (1996), 75 Ohio St.3d 195, 202-203. Rather, even where a motion in limine is denied before trial, a timely objection must be made at trial to preserve the issue. Id. This is true even if the defendant concludes the motion in limine hearing by reiterating his objection to the court's ruling. See, also, State v. Hancock, 108 Ohio St. 3d 57,2006-Ohio-160, ¶ 59 (notwithstanding motion in limine, objecting party must challenge evidence during trial when issue is presented in full context).
 {¶ 54} Because appellant failed to challenge the evidence during trial when it was presented in full context, only a plain error analysis can be conducted. See Evid.R. 103(D); Crim.R. 52(B). That is, the appellate court may recognize plain error if substantial rights are affected, even if the error was not brought to the attention of the court. Crim.R. 52(B). However, before an appellate court can recognize plain error, the court must find obvious error affecting substantial rights in that the error was clearly outcome determinative. State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 62. See, also, Hancock at ¶ 60. Plain error is a discretionary doctrine to be used with the utmost of care by the appellate court only in exceptional circumstance to avoid a manifest miscarriage of justice. Noling at ¶ 62.
 {¶ 55} Considering our above analysis of the other trial evidence presented on appellant's guilt, such circumstances do not exist here and we are not compelled to exercise our plain error discretion. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 56} Appellant's third assignment of error contends:
 {¶ 57} "THE TRIAL COURT ERRED IN FAILING TO ADMIT ALL OF THE STATE'S REPORTS EXCEPT ONE WHICH CONTAINED EXCULPATORY EVIDENCE STATING TRACES OF A THIRD DNA WHICH WAS NEITHER THE VICTIM'S NOR THE DEFENDANT'S DNA WAS PRESENT ON THE VICTIM."
 {¶ 58} At the close of evidence, the defense asked to admit all of their exhibits. The state objected to admission of the report from the state's DNA expert, which the defense believed contained an exculpatory statement they apparently wished to emphasize in closing arguments. The state noted that their witness testified in court without using her report. The state also pointed out that the report is confusing because the asterisked statement, "Additional DNA type detected, but below reporting *Page 15 
standards" makes it sound like some third party's DNA was found in one of the bite marks. However, the state noted that the report and other notes actually establish that the portion of the additional sample found was too small to type but was consistent with the victim's DNA. (Tr. 734). The state claimed that in order to fully understand what the asterisked statement meant, over fifty pages of notes would have had to have been reviewed and explained. The state also remarked on the fact that the issue regarding the asterisked statement was not raised by either side during the expert's testimony where such statement could have been thoroughly explained. (Tr. 736).
 {¶ 59} The trial court commented that it does not usually let disputed reports come in where the expert testified. (Tr. 735). The court explained that when they are offered without objection, they can be admitted. (Tr. 735-736). But, where there is an objection, the witness did not refer to the report, and the report contains unexplained symbols not brought out in the testimony, then the court would not allow the report without stipulations as to what the asterisks mean. (Tr. 735). Because the defense would not stipulate, the court sustained the state's objection to the report. (Tr. 736).
 {¶ 60} On appeal, appellant claims that the report contained exculpatory evidence because it mentioned a trace of a third type of DNA which could have established appellant's innocence. (One of appellant's defense theories was that the victim's estranged husband was the murderer.) Appellant characterizes the trial court's exclusion as being based upon hearsay and as being inconsistent since other reports were admitted. Appellant urges that the state should have questioned its expert on the statement about the additional DNA type.
 {¶ 61} On the contrary, the state claims that if the defense believed the statement in the report to be exculpatory, they should have asked the witness about the statement in the report, which would have triggered redirect on the true meaning of the statement. The state urges that if the court admitted the report without explaining the asterisks, then the defense would create a false impression on the jury without being subjected to the expert's explanation on the stand. The state does not characterize the court's exclusion as hearsay but notes that the court explained that it does not typically admit a report where testimony was presented without reference to *Page 16 
such report. The state also points out that other reports were only admitted because neither party objected to them.
 {¶ 62} Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Evid.R. 103(A). The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180. As such, unless the court has clearly abused its discretion and the defendant has been materially prejudiced by the exclusion of evidence, the reviewing court should not interfere. SeeState v. Hymore (1967) 9 Ohio St.2d 122, 128. An abuse of discretion is defined as an act that is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. The issue of whether evidence is confusing or misleading is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury. City of Columbus v. Taylor (1988),39 Ohio St.3d 162, 164.
 {¶ 63} Here, the DNA analyst testified without mentioning the report in direct or cross-examination. There is absolutely no indication that her referral to notes at trial was actually a referral to the report, and there was no argument that her notes be received as an exhibit. See Evid.R. 803(5) (prior recollection recorded can be received as exhibit if offered by adverse party).
 {¶ 64} Neither the state nor the defense referred to the report in questioning the analyst. (Tr. 516-534). In fact, the defense's cross-examination of this witness constituted a mere three pages. (Tr. 524-526). As the state pointed out in their post-trial response, it appears the defense purposefully failed to mention the asterisked statement while the authoring witness was on the stand so they could refer to the part that seemed to benefit them in closing arguments without her rebutting testimony. Also, as the state notes, the defense did not have their own DNA expert mention the supposed existence of a third type of DNA. Had the defense raised the issue or even just the existence of the report, the state would have been aware of their reliance on the report and could have explained any confusing points therein. The tactics used by the defense tend to establish a desire to mislead or confuse the jury. *Page 17 
 {¶ 65} Nevertheless, we need not determine whether the report would be unduly confusing because, as aforementioned, neither the state nor the defense introduced or identified the report in their cases. Appellant's focus on the fact that other reports were admitted is irrelevant where no objections were entered as to these reports and where there is no contention that such other reports were not identified at trial. SeeState v. Campbell (Mar. 14, 1984), 9th Dist. No. 1302 (where the court excluded the firearm report of defendant's witness but admitted report of state's witness which was not objected to).
 {¶ 66} Without introduction of a report and identification or authentication by a witness, such report need not be admitted into evidence according to Evid.R. 901(A). Although there is no real contention that the report is not the expert's true report since it was provided to the defense by the state, reports are not automatically admissible as exhibits when no one ever identifies and/or introduces such reports during trial. Finally, we note that the report could not be introduced for the first time at the end of trial if used as a prior inconsistent statement because the witness was not given a prior opportunity to explain. See Evid.R. 613(B). See, also, State v.Hunter (June 5, 1984), 4th Dist. No. 1465 (where court excluded report prepared by state's expert even where it was in fact used to cross-examine the state's witness). Accordingly, the trial court could properly use its broad discretion to exclude the report. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 67} Appellant's fourth assignment of error alleges:
 {¶ 68} "THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT A MOTION FOR MISTRIAL WHEN THE STATE ELICITED TESTIMONY FROM ONE OF ITS SUSPECTS ON THE WITNESS STAND WHEREIN THE SUSPECT TESTIFIED THAT THE STATE HAD GIVEN HIM A `LIE DETECTOR TEST."
 {¶ 69} Appellant called the victim's estranged husband, James Forbes, as a defense witness. One of the defense theories was that Mr. Forbes killed his wife. On cross-examination, the state asked Mr. Forbes if the police had asked him where he was on the night of the murder. (Tr. 699). Instead of directly answering, he then *Page 18 
recited how he rushed to the victim's house (with his girlfriend of nineteen months) when he heard the victim was dead. (Tr. 698, 700). He was worried about their thirteen-year-old son. He concluded that he spoke to the police at the scene and they asked where he was the night before. The state queried, "And did you tell them?" He responded:
 {¶ 70} "I told them exactly where I was at. And I offered to take a lie detector test, because I felt they were going to try to pin it on me." (Tr. 700).
 {¶ 71} The defense objected and moved for a mistrial. (Tr. 700, 731). The court responded:
 {¶ 72} "All right. You know, this is one case. This isn't multiple cases. This part of what you have just heard about the lie detector test and the offer to take it should never have been said in this courtroom, because lie detector tests in Ohio aren't admissible, anyway. I'm going to ask each and every one of you just put that outside your minds, because that really isn't a part of this case. Is there anyone on this jury who cannot do that? All right. We'll proceed. The motion for a mistrial is overruled." (Tr. 700-701).
 {¶ 73} In Ohio, the results of a polygraph examination are not admissible in evidence in a criminal trial for purposes of corroboration or impeachment unless the state and the defense stipulate to their admissibility. State v. Jones (2001), 91 Ohio St. 3d 335, fn.2, citingState v. Souel (1978), 53 Ohio St.2d 123. Appellant thus complains that all of the defense evidence pointing toward Mr. Forbes was quickly diffused when the state elicited testimony improperly mentioning a polygraph test.
 {¶ 74} First, we point out that a decision to deny a mistrial is within the trial court's sound discretion. State v. Ahmed,103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92. Second, we would not characterize the state as having "elicited" the testimony. That is, the witness's statement was not responsive to the state's questioning. Third, we note that contrary to the text of the assignment of error, the witness's statement did not reveal that a polygraph test was performed, only that an offer to take the test was made. Obviously then, there was also no mention of the results of the test.
 {¶ 75} Finally, we point to the facts of the Jones case where the state did in fact specifically ask its own witness on redirect whether the witness had been given a lie *Page 19 
detector test. Jones, 91 Ohio St. 3d at 344. The defense objected, but the witness responded affirmatively before the court could rule. The trial court then sustained the objection, instructed the jury to disregard the question, instructed the state to refrain from making any further reference to a lie detector test and denied the defense's motion for a mistrial. The Supreme Court found no error in the trial court's reliance upon curative instructions and its refusal to grant a mistrial in response to the witness's testimony. Id. The Court noted that the jury is presumed to have followed the trial court's instructions. Id., citing State v. Raglin (1998), 83 Ohio St.3d 253, 264.
 {¶ 76} In the case before us, the witness merely noted an offer to take, not the actual administration of a polygraph examination. The trial court gave a proper curative instruction. Additionally, the court specifically inquired whether the jurors could abide by its order. There is no reason to presume that the jury failed to follow the trial court's admonition. As such, the court's refusal to grant a mistrial is affirmed.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 77} Appellant's fifth and final assignment of error contends:
 {¶ 78} "THE STATE DID NOT MEET ITS BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT DEFENDANT CAUSED THE VICTIM'S DEATH WITH PRIOR CALCULATION AND DESIGN."
 {¶ 79} Sufficiency of the evidence deals with adequacy rather than weight of the evidence. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In viewing a sufficiency of the evidence argument, a conviction will not be reversed unless the reviewing court holds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. State v. Goff (1998),82 Ohio St.3d 123, 138.
 {¶ 80} The elements of the within aggravated murder are: purposely, and with prior calculation and design, causing the death of another. See R.C. 2903.01(A). Appellant argues that there was insufficient evidence to prove that he was the person who caused the victim's death and that he acted with prior calculation and design.
 {¶ 81} As for his identity, his DNA was found inside both bite marks. (Tr. 307, 522-523, 723-724). It was established that such large amounts of testable DNA do not *Page 20 
typically collect merely from skin shedding but are characteristic of a bodily fluid such as saliva. (Tr. 527-529). Appellant's dental impression matched one of the bite marks; the other bite was not clear enough to match. (Tr. 553-554).
 {¶ 82} In addition, the victim had been in the process of extricating herself from a relationship with appellant. He was not taking the rejection well. He called her often in the days prior to the murder. He came over uninvited. (Tr. 142). He insisted on coming with them on the victim's last night, even though she clearly did not want him there. (Tr. 97, 145). Moreover, appellant was the last person seen with the victim.
 {¶ 83} He was dropped off at her house sometime after 12:30 a.m. and was seen assisting her to her home. (Tr. 103). Her time of death was estimated to be one hour, or at most two hours, after eating cheese cubes. (Tr. 396-398). It was near midnight when the group was estimated to have left the bar where cheese had been served. (Tr. 101, 243). Construing this evidence in the light most favorable to the state, a reasonable person could conclude that the victim died immediately after last being seen with appellant. Then, construing all of the evidence in the light most favorable to the state, a rational juror could find it was appellant who caused the victim's death.
 {¶ 84} We now evaluate the prior calculation and design element. Instantaneous deliberation is not prior calculation and design.State v. Cotton (1978), 56 Ohio St.2d 8, 11 (yet finding sufficient time between firing of non-fatal shots and firing of fatal shot at officer). Rather, this element requires a scheme designed to implement the calculated decision to kill. Id. See, also, State v. Hanna,95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 39 (purpose must be reached by a definite process of reasoning in advance of the murder, which process includes a mental plan involving studied consideration of the method and means of causing death). However, the classic case of the well-planned, cold-blooded killing is not necessary. State v. Taylor (1997),78 Ohio St.3d 15, 19. There is no bright-line test; each case depends on the particular facts and circumstances existing therein. Id. at 20.
 {¶ 85} Here, prior calculation and design can be found from various pieces of evidence. For instance, appellant's other girlfriend testified that he told her to give him two weeks and then he would be free of the victim and would be all hers. He also *Page 21 
made mention that she would be able to read in the paper about some future event relative to his freedom from the victim. (Tr. 440). Coincidentally, the victim was murdered two weeks after he made these statements.
 {¶ 86} Moreover, the victim had been drugged with seven to eight times the maximum therapeutic dose of a muscle relaxant. (Tr. 382-383). The girlfriend who had recently left appellant took this same muscle relaxant. (Tr. 445). Thus, he had access to the drug near the time he made a prediction about being free in two weeks.
 {¶ 87} Additionally, testimony established that he was pushing drinks on the victim that night. (Tr. 234). She had even noted that a beer he bought her tasted odd. (Tr. 99). He was upset when she abandoned that beer. (Tr. 100). She became suddenly and severely impaired after drinking a shot he urged her to drink. (Tr. 234). This can be interpreted as his implementation of a preconceived plan or scheme during the hours prior to the murder.
 {¶ 88} Furthermore, evidence suggests that he encouraged the victim's son to stay away from the house that night by stating that the victim would be out late when in fact other evidence established that he knew she would be returning home very soon. (Tr. 103, 172, 175). Considering all of the foregoing facts in the light most favorable to the state, a reasonable juror could find that appellant caused the victim's death with prior calculation and design.
 {¶ 89} Although the text of the assignment of error does not mention it, appellant also contends that his conviction was against the manifest weight of the evidence. Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. Thompkins, 78 Ohio St.3d at 387. In considering the issue, the reviewing court determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id. Where a criminal case was tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. Id. at 389. This is only done in exceptional circumstances. Id. at 387.
 {¶ 90} When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. State v.Gore (1999), 131 Ohio App.3d 197, *Page 22 
201. The jury is best suited to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying before it. Seasons Coal Co. v.Cleveland (1994), 10 Ohio St.3d 77, 80; State v. DeHass (1967),10 Ohio St.2d 230, 231.
 {¶ 91} Appellant points to the fact that no blood evidence was found in his truck. (Tr. 310-311). He cites to the affidavit in support of a search warrant, which revealed that the truck was at the victim's house the evening the group went out. (Tr. 473). He states that there was a blood trail, and thus, blood evidence would have been discovered in his truck if he were the killer. The state counters that there was very little blood at the scene because the victim bled into her chest cavity. The state disputes the characterization of some smears of blood as a blood trail that would require transfer to any vehicle entered. (Tr. 266-276).
 {¶ 92} We note that there was trace blood evidence not visible to the naked eye in the victim's sink, implying the murderer washed up, possibly only remembering to do so after making the blood smears. (Tr. 498, 508). Additionally, a call to a cab company in Wheeling was made from appellant's cell phone at approximately 12:30 a.m. (Tr. 495-496). Thus, one could conclude that although his truck was gone by the time the body was found the next day, he could have taken a cab home to clean up and then come back for his truck. Contrary to appellant's contention in his reply brief, the state need not specifically argue this theory at trial for us to note the evidence placed into the record and note any reasonable inferences that a juror could make from such evidence. In any event, whether appellant would necessarily leave blood evidence in his truck after the murder and whether he even drove his truck thereafter are weight of the evidence questions best left to the jury.
 {¶ 93} Contrary to appellant's next claim, it is certainly not against the weight of the evidence to conclude that appellant drugged the victim's drinks that night. As aforementioned, she abandoned the first beer he bought her, opining that it tasted funny. This abandonment upset appellant. He bought her more beers and shots that night. He pestered her into drinking a shot after she repeatedly refused to accept it and after she seemed to purposely spill another shot. She became suddenly impaired, more than warranted from the amount she drank. *Page 23 
 {¶ 94} The fact that a pill bottle containing four pills of Flexeril was later found in the victim's residence does not mean that appellant did not place Flexeril in the victim's drinks that night. (Tr. 207). It could reasonably be viewed as just one more possible source for appellant to obtain the drug. As noted previously, his other girlfriend took Flexeril. The victim had seven to eight times the maximum therapeutic dose in her system when she died. (Tr. 383). This is considered a relatively high level, in the toxic range known to place a person in a coma. (Tr. 383-384). A reasonable person could choose to conclude that she did not do this to herself, if that is what appellant is suggesting here.
 {¶ 95} In conclusion, there are no exceptional circumstances weighing heavily against appellant's conviction. There was substantial and overwhelming evidence presented which the jury could weigh in favor of conviction. Appellant's conviction for aggravated murder was not contrary to the manifest weight of the evidence. This assignment of error is overruled.
 {¶ 96} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1