[Cite as *Erzurum v. Erzurum*, 2021-Ohio-1162.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

HALIL ERZURUM ET AL.,

Plaintiffs-Appellees,

v.

SERHAT ERZURUM,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0012**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2019 CV 339

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed and Vacated and Remanded.

---

*Atty. Mark Koberna,* and *Atty. Sean Koran,* Sonkin and Koberna, LLC, 3401 Enterprise Parkway, Suite 400, Cleveland, Ohio 44112, for Plaintiffs-Appellees and

*Atty. Marshall Buck,* Comstock, Springer & Wilson Co., LPA, 100 Federal Plaza East, Suite 926, Youngstown, Ohio 44503.   Atty. *Jeff Kurz,* 42 North Phelps Street, Youngstown, Ohio 44503, for Defendant-Appellant.

Dated:  March 31, 2021

_____

**D'Apolito, J.**

{¶1}   Defendant-Appellant Serhat Erzurum appeals the judgment entry of the Mahoning County Court of Common Pleas setting aside two deeds transferring real property to him from his parents, Plaintiffs-Appellees Halil and Sevim Erzurum, based on jury verdicts finding that the transfers were procured through undue influence and as a result of duress. The deeds were executed on August 13, 2018 and January 18, 2019.

{¶2}   Appellant advances nine assignments of error.  First, Appellant argues that the trial court abused its discretion in admitting irrelevant and prejudicial evidence regarding a 2003 qui tam action against him, his 2004 and 2012 bankruptcy cases, and his reason for residing in Turkey from 2005-2012.  Appellant further argues that testimony regarding Halil's mental acuity should not have been admitted because Appellees' expert was not a medical doctor.   Next, Appellant contends that the trial court abused its discretion in declining to admit evidence that Sevim lived in fear of and was subject to the undue influence of Halil, but admitting similar evidence regarding Sevim's relationship with Appellant.  Finally, Appellant asserts that there was insufficient evidence to support the jury's verdict, that the verdict is against the manifest weight of the evidence, and that the trial court erred in denying a motion for judgment notwithstanding the verdict and for new trial, insofar as the jury returned its verdict in less time than was required to review the exhibits admitted into evidence at trial.

{¶3}   Having reviewed the record, we agree that the trial court abused its discretion in admitting certain evidence, and that the admission of said evidence caused material prejudice to Appellant.  As we find that the verdicts turned exclusively on the credibility of the witnesses at trial, and Appellant's credibility was irreparably damaged by the improperly-admitted evidence, the judgment entry setting aside two deeds is reversed and  vacated and this matter is remanded for a new trial.

## FACTS AND PROCEDURAL HISTORY

{¶4}   Appellees immigrated to the United States from Turkey and began purchasing apartment buildings in the 1970s. Halil, an engineer educated at the Case

Case No. 20 MA 0012

Institute of Technology, performed his full-time employment during the day, then maintenance at the apartments in the evenings. Sevim managed the daily operations at the apartments, which included the collection of rents and cleaning and showing the units.

**{¶5}** Appellees had five children, two sons and three daughters. Appellant, the oldest of the children, is an obstetrician-gynecologist with a former medical practice in Pennsylvania. Serpil Erzurum, the oldest daughter, is a pulmonologist, who chairs the Lerner Research Institute at the Cleveland Clinic. Sergul Erzurum is a local pediatric ophthalmologist. Sevil Erzurum, the youngest daughter, suffers from schizophrenia and lives with Appellees. Zafer Erzurum, Appellees' youngest child, was a vascular surgeon who committed suicide in 2013.

**{¶6}** At all times relevant to the complaint, Appellees owned and operated 25 apartment buildings with 145 rental units, and a tax value of $3.9 million at the time of trial. According to Appellant's testimony, the real property was valued between $4 to 5 million dollars, and generated a gross annual revenue of $770,000 to $800,000. Among the properties were three apartment buildings known as the "Lofts," which were valued at $1.5 million and considered the most valuable of the Erzurum's apartment buildings.

**{¶7}** Appellant began his medical practice in 1993 in the state of Pennsylvania. He opened a laser vein clinic in 2001, which grew to twelve locations by 2003. The laser vein clinics employed ten doctors and generated millions of dollars in gross income.

**{¶8}** According to Appellant's testimony, he was unaware that a physician working at one of the clinics was improperly coding procedures, which were then billed to Medicare. Appellant testified that the offending doctor and billing clerk subsequently acted as whistleblowers and filed a qui tam action against Appellant and the clinics under the False Claims Act ("FCA" or "Act") in 2003.

**{¶9}** The FCA "prohibits submitting false or fraudulent claims for payment to the United States, [31 U.S.C.] § 3729(a), and authorizes qui tam suits, in which private parties bring civil actions in the Government's name, § 3730(b)(1)." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011). The Act encourages relators "to act as private attorneys-general in bringing suits for the common good," *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 507 (6th

Cir. 2009) (internal quotation mark omitted), and provides often-lucrative incentives to do so.

**{¶10}** If the government proceeds with the action, the qui tam plaintiff is entitled to "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim." 31 U.S.C. § 3730(d)(1). If the government chooses not to intervene, the qui tam plaintiff can recover even more – "not less than 25 percent and not more than 30 percent" of the same. *Id.* § 3730(d)(2). The government did not intervene in the qui tam action against Appellant.

**{¶11}** A qui tam action is a civil proceeding. The FCA action did not affect Appellant's ability to practice medicine, which he continued to do during the pendency of the qui tam action.

**{¶12}** Most of the medical bills at issue in the qui tam action were between $30.00 and $180.00, but each of those allegedly fraudulent bills carried a $7,500.00 fine. Default judgment was entered against Appellant and the laser vein centers in the qui tam action in the amount of $6,323,321.20 on March 12, 2009. The outstanding judgment was ultimately satisfied in full for a reduced amount of $119,000.00. Halil provided the money to Appellant satisfy the judgment. The laser vein clinics were shuttered as a result of the civil action.

**{¶13}** Appellant conceded that he was $11 million dollars in debt as a result of the failure of his businesses, and he filed bankruptcy in 2004 in order to discharge his unsecured debt. However, the bankruptcy case was dismissed due to Appellant's failure to appear at creditors' meetings after Appellant, his wife Nilgun, and their two daughters relocated to Turkey in 2005.

**{¶14}** According to Appellant's testimony, the family moved to Turkey because Nilgun's mother, a Turkish citizen, was diagnosed with Alzheimer's Disease. Serpil testified that Appellant fled the United States because he feared that criminal charges would be filed as a result of the federal investigation that resulted from the qui tam action. Appellant denied that his move to Turkey was sudden, but conceded that neither his parents nor his siblings were aware that he was moving to Turkey.

{¶15} Appellant and his family resided in Turkey from 2005-2012. On more than one occasion, Appellant, while residing in Turkey, requested financial assistance from Appellees and Serpil in order to support his family.

{¶16} According to Appellant's testimony, he and his family returned to the United States in 2012 because Halil promised to transfer ownership of the apartments to Appellant if he would return to the United States and manage the properties. Appellant conceded that he and Nilgun also wanted to return to the United States so their daughters could be educated here.

{¶17} At the time, Halil had been diagnosed with colon cancer and Sevim suffered from arthritis, diabetes, and hypertension. Appellant testified that he received an emotional telephone call from Appellees, in which they disclosed Halil's cancer diagnosis and their fear that Halil might not survive. Appellant further testified that Appellees pleaded with Appellant to return to the United States to assume management of the apartments. According to Serpil's testimony, Appellant asked his parents to work at the apartments, because Appellant's medical license had lapsed while he was in Turkey, and he would have no way to support his family upon his return to the United States.

{¶18} Appellant denied that he was in any financial trouble in Turkey. Serpil testified that Appellant left Turkey because he was in debt to "bad people," despite the fact that Appellees and Serpil had sent Appellant tens of thousands of dollars over the years. Halil testified that he had expended over $300,000.00 paying Appellant's debts, legal bills, and, for a time, the mortgage on Appellant's residence in Pennsylvania after Appellant moved to Turkey. Serpil further testified that Appellant left Turkey because the country was returning to a religious orthodoxy.

{¶19} Serpil testified that Appellant and Nilgun were furious when they learned that Halil had allowed their residence in Pennsylvania to be sold at a Sheriff's sale. Appellant was also angry that medical equipment, which he valued at $2 million and had stored at the Lofts while he was in Turkey had been sold by his brother-in-law on eBay. A chandelier, which Appellant valued at $100,000.00, was also taken from the Pennsylvania residence and displayed in Sergul's home.

{¶20} Appellant and his family resided with Appellees at first, then, according to Halil's wishes, Appellant and his family moved rent-free into one of Appellees'

apartments. Serpil testified that Appellant began pressuring his parents to transfer ownership of the apartments to him immediately upon his return to the United States. According to Serpil, Appellant feared that Halil would predecease Sevim, and that she would transfer ownership of the apartments to Sergul. Appellant denied any rift with Sevim. According to his testimony, he was her favorite child.

**{¶21}** Serpil testified that Appellees had expressed throughout their lives their intent that the apartments would be inherited by all of their children upon their deaths. Appellees planned that the apartments would provide income for Sevil and their grandchildren.

**{¶22}** Appellant refiled his bankruptcy petition in September of 2012 shortly after returning from Turkey. According to the 2012 petition, Appellant's debts exceeded $20 million. Appellant testified that he refiled the bankruptcy petition due to Halil's insistence that Appellant be debt-free before assuming control of the apartments. Both bankruptcy petitions were admitted into evidence.

**{¶23}** After returning to the United States, Appellant worked at the apartments with his parents from 2012-2013. Appellant testified that Appellees expected Nilgun to be a servant for them five days a week during that time. Based on an incident in which Halil became violent toward Nilgun – he threw his walker at her, Appellant resigned his management duties at the apartments.

**{¶24}** Appellant returned to medicine after reactivating his license in 2014. He received annual compensation in the amount of $155,000-$160,000 while employed by the Visiting Physician's Association ("VPA") from 2014-2017.

**{¶25}** Appellant testified that his parents had always planned that ownership of the apartments would be transferred to him at some point in the future. Appellant offered into evidence a June 18, 2014 electronic mail from Halil to Appellant. It appears that the correspondence was sent after the two men had argued.

**{¶26}** Halil expresses his desire for Appellant to "take over all [Halil's] apartments, do the work, enjoy the income." (*Id.* at 798-800.) The electronic mail continues, "In the past, you wanted your name on the deeds to be onboard gull time [sic] * * *I checked the legality of it with Gary Rosati * * *If you have not changed your name [sic] about this, let me know and it will be done."

Case No. 20 MA 0012

**{¶27}** A maintenance worker at the apartments, Javier Arroyo testified that "[i]n the past, even before Appellant even [sic] came around, [Halil] used to tell [Arroyo] that [Halil] was getting too old to do this, you know. When [Appellant] comes, [Halil was] going to hand them over to [Appellant]." (*Id.* at 641.) Furthermore, the leasing agent for the apartments, Michelle Giuliani testified that, "It had always been said [by Appellees] that Appellant was going to take the apartments over. [Halil] was going to give them to [Appellant]." (*Id.* at 650.)

**{¶28}** As Appellees entered their nineties, assistance with management of the apartments became a necessity. According to Appellant's testimony, Appellees, particularly Halil, began pressing Appellant to quit his job at VPA in 2016 in order to manage the apartments.

**{¶29}** Serpil testified that, in 2016, she was concerned about Appellees' failing health. She further testified that she encouraged her parents to transfer ownership of the Loft apartments to Appellant to provide him with the financial security to leave his employment with the VPA. After a family meeting, at which Appellees refused to transfer ownership of any of the apartments to Appellant, Halil left Serpil a voicemail stating that Appellees had discussed the matter and agreed to transfer the Loft apartments to Appellant.

**{¶30}** According to Serpil, Appellees planned to transfer ownership of the Lofts to Appellant and Serpil in 2016, but she told them she had no desire to have any ownership interest in the apartments. Serpil testified at trial that she was a physician and had no interest in being an entrepreneur. According to Serpil, Appellees did not transfer ownership of the Lofts to Appellant in 2016 because of Sevim's distrust of him.

**{¶31}** Appellant testified that he did not want ownership of the Lofts in 2016. He testified that he was "busy" being a physician and "there's always strings attached [with Halil.]" (*Id.* at 162.) Appellant further testified that leaving the field of medicine at that age would effectively be the end of his career. Although he was willing to help his parents, he was unwilling to undertake a full-time role at the apartments.

**{¶32}** At the time, Halil suffered from a host of physical problems, including multiple cancer diagnoses from which he nearly died in 2012, heart failure, and a near fatal stroke in 2010. Halil is extremely hard of hearing. Sevim also suffers from various

maladies, including severe diabetes and neuropathy in her legs. She has a history of falls in which she broke several bones, and she uses a walker.

{¶33} In May of 2017, Arroyo accidentally struck Halil with a work van. Halil, who was prescribed an anticoagulant at the time, was knocked off his feet and struck his head, which caused severe intracerebral bleeding.

{¶34} Halil was evaluated by multiple physicians following the accident. Initially, he was diagnosed with mild cognitive impairment, with no focal deficits or strength issues. In the following days, Halil showed a slowed response to complex verbal commands. Halil's physician opined that he would improve all areas of memory with rehabilitation. Halil returned home after a short period of inpatient rehabilitation.

{¶35} Serpil testified that Halil was unable to function for months after the accident and that he had a dire initial cognitive assessment. However, she conceded that Halil's cognition improved steadily over the next year. Serpil testified that Appellant was preoccupied at the time that Sergul would seize upon Halil's impairment to convince Appellees to transfer the apartments to Sergul. Serpil and Sevim testified that Halil was never the same after the accident.

{¶36} However, Halil's employees and his personal attorney, James Lanzo described Halil as being sharp and capable after the accident. Halil returned to work at the apartments within a couple months. According to workers at the apartments, Arroyo, Enrique Cordero and Michelle Giuliani, who had daily interactions with Halil, he was back to his normal self, driving an automobile, giving orders, and taking care of business in the same manner he had before the accident. Lanzo testified that Halil appeared in fifteen court hearings after the accident. Halil himself stated that "[he] didn't have any problems that could hold [him] down" after the accident. (*Id.* at 367.)

{¶37} Appellees called Mark Lovinger, Ph.D., a clinical psychologist, to testify about Halil's performance on the Montreal Cognitive Test ("MOCA") after the accident. The MOCA test is one of many tests administered to Halil after the accident, but one in which his initial performance was poor. In September of 2017, Halil scored a 15 on the MOCA test, but he improved to a score of 19 by February of 2019 (moderate impairment) and then improved to a score of 22 by July of 2019 (mild impairment).

{¶38} During his direct testimony, Lovinger testified to a reasonable degree of medical certainty that Halil had mild dementia and Sevim had moderate dementia when he evaluated them in February and July of 2019. However, on cross-examination, Lovinger conceded that he was not a medical doctor, and he amended his testimony to say that his opinion was within a reasonable degree of psychological certainty. He further testified that he was compensated for his testimony in the amount of $16,000.00

{¶39} In 2017, Appellees and Appellant finally reached an agreement that Appellant would assume the full-time management of the apartments. In November of 2017, Appellees conveyed the Lofts to Appellant in order to provide to Appellant the financial incentive to leave his medical practice.

{¶40} According to Appellant's testimony, Halil entered into an oral agreement at that time to transfer the remaining apartments to Appellant, in addition to the Lofts. Appellant testified that the only reason that he was comfortable leaving his employment with the VPA was the oral agreement that ownership of all of the apartments would ultimately be transferred to him.

{¶41} In the fall of 2017, Halil instructed Appellant to open his own accounts so that the rent deposits could be made directly into them and Halil arranged for all of the bills to bear Appellant's name. According to Appellant's testimony, Appellees promised to transfer the remaining apartments to Appellant and, in turn, Appellant promised to pay Halil $10,000.00 per month.

{¶42} Halil notified the tenants in a letter on December 21, 2017 that all rent checks and maintenance orders should be sent to Appellant. As a consequence, rents were deposited into a bank account in Appellant's name, and he paid the bills and managed the apartments. According to Appellant, he had a good relationship with his parents after he assumed management of the apartments in 2018.

{¶43} Appellant took over the operations of the apartments on January 1, 2018 and paid Halil $10,000.00 per month throughout 2018. Halil testified that the $10,000.00 payments were earmarked for Sevil's long term care.

{¶44} In July of 2018, Sevim caused a motor vehicle accident and was hospitalized for two days in Cleveland. She recuperated at Serpil's home in Cleveland. The following month, Sevim suffered a fall and broke her pelvis in three places. She was

admitted to a nursing home for rehabilitation in Youngstown for roughly two weeks. Serpil testified that Sevim had low cognitive abilities during this period and was frequently agitated and confused.

{¶45} According to Serpil, Appellant was incensed during Sevim's convalescence because Sergul frequently visited Sevim. According to Serpil, Appellant believed that Sergul was using her many visits to convince Sevim to transfer ownership of the remaining apartments to Sergul. Serpil further testified that Appellant said Sevim deserved her injuries because she did not love her children. According to Serpil, Sevim was afraid of Appellant.

{¶46} After leaving the nursing home, Sevim resided in Cleveland with Serpil from late August to late October. Around that same time, Sevil, Appellees' youngest daughter, suffered a setback after her physician stopped prescribing an anti-psychotic medication, which she had been prescribed for many years. Sevil, who lives with Appellees, was institutionalized for roughly a year while the anti-psychotic medication was reintroduced.

{¶47} According to Serpil, Halil, who was living alone for the first time is his life, was scared, depressed, and confused. Nilgun was cooking meals for Halil and maintaining the house. Halil testified that Appellant and Nilgun cared for him in Sevim's absence.

{¶48} It was during that time, when Sevim and Sevil were absent from the household, that Halil made arrangements with his attorney, James Lanzo, to transfer the remaining apartments to Appellant and Serpil. Lanzo testified that he knew Halil well and had represented him in many matters, including court cases in which Halil appeared after he was injured in 2017.

{¶49} Halil was 97 years of age when he testified at trial. According to his testimony, he contacted Lanzo because Appellant relentlessly pestered him to transfer ownership of the apartments. Appellant repeatedly told Halil that Halil was very ill and on the verge of death. Appellant was concerned that Sevim would outlive Halil and "fire" Appellant.

{¶50} According to Halil, he finally agreed to transfer a one half-interest in the apartments to Appellant. Halil testified that "[Appellant was] pretty good at convincing [Halil], especially since [Halil] was sick or more or less in bed." (*Id.* at 346.) Halil continued,

Case No. 20 MA 0012

"[Appellant said] make all of the apartments to my name and then I'll turn it over to your name." (*Id.*)

**{¶51}** Lanzo testified that he prepared the August 13, 2018 deed based on Halil's expresed desire to transfer the apartments to Appellant and Serpil. Halil was Sevim's power of attorney. Appellant testified that Sevim was too ill to participate in the property transfer. As a consequence, Halil employed the power of attorney to sign on Sevim's behalf.

**{¶52}** Lanzo was asked, "Did you notice any effect on – any diminished mental capacity, ability to influence him, anything at all that would suggest to you that he was not the same sharp, intelligent man you had known for years?" Lanzo replied, "No." (*Id.* at 710-711.) Lanzo stated that Halil was logical and coherent during their meeting, and Lanzo was unaware that Halil was in an accident in 2017 until his 2019 deposition in this case.

**{¶53}** Lanzo testified that he had never had any concern about Halil's capacity during their ten-year relationship. Lanzo further testified that Halil executed the August 13, 2018 deed of his own accord and used Sevim's power of attorney to sign for her. According to Lanzo, Halil never suggested that he was acting under any kind of undue influence at the time he signed the deed.

**{¶54}** Halil conceded that, before he signed the August 13, 2018 deed, he consulted his tax preparer in order to ascertain the tax consequences of the transfer. Halil admitted that, during his deposition, he conceded that Lanzo explained the legal effect of the deed and that no one forced him to sign the deed. On cross examination, Halil admitted that he signed the deed of his own free will. However, shortly thereafter, he testified that Appellant forced him to sign the deed.

**{¶55}** According to Appellant's testimony, Halil told Appellant that he wanted to be the one to tell Serpil that he transferred the one-half interest in the remaining apartments to her. On December 23, 2018, while Serpil and her children were visiting, Halil took Serpil aside and divulged the "secret." (*Id.* at 251.) Serpil asked Halil if he had executed a will, and he explained that he executed a deed. An argument ensued, according to Serpil, because Halil insisted that ownership of the apartments would not transfer to her and Appellant until Halil's death.

**{¶56}** When Sevim was informed of the transfer, she was infuriated because Halil had used her power of attorney and she knew that Serpil did not want the apartments in her name.  Sevim flew into a rage and the police were called to the residence on Christmas day.

**{¶57}** In a text message chain admitted into evidence, Serpil chastises Appellant for his participation in the execution of the August 13, 2018 deed.  Serpil writes, "You know you should have talked to me. What you did was wrong. I don't deserve it."

**{¶58}** Contrary to his testimony that he did not disclose the transfer to Serpil because Halil wanted to surprise her, Appellant responds, "I thought you knew." Serpil replies, "Lie."  Serpil characterizes Appellant's conduct with respect to the deed as a "Sergul move." On December 26, 2018, Serpil, at her first opportunity, executed a quitclaim deed that transferred her half of the apartments back to Appellees. (*Id.* at 262-264.)

**{¶59}** According to Appellant's testimony, Halil called Appellant to Appellees' home during the second week of January, 2019, to inform Appellant that Appellees had decided to transfer their half of the remaining apartments to him. Sevim also confirmed during her deposition that after the Christmas day argument, Appellees had jointly decided to give the remaining one-half interest in the apartments to Appellant.  However, Sevim denied that they agreed to transfer the remaining one-half interest in the apartments during cross-examination.

**{¶60}** According to Appellant, Halil instructed Appellant to have the deed prepared.  The deed was prepared by Jeffrey A. Kurz, who had never previously met either party.

**{¶61}** On January 17, 2019, Serpil was in Washington, DC at a National Institute of Health meeting, when she received a call from Sevim.  Sevim asked Serpil to bring Sevim to Cleveland.  Serpil explained that she would be flying back to Cleveland the following day and would drive to Youngstown to retrieve Sevim.  When Serpil telephoned her mother on January 18, 2019, Sevim tearfully revealed that she had just returned from the bank with Appellant and that she had signed "something" that she could not identify. (*Id.* at 267.)

{¶62} Halil testified that Appellees accompanied Appellant to the bank and signed the January 18, 2019 deed because they feared that Appellant might physically harm them. Halil further testified that Appellant warranted that, should Halil predecease Sevim, Sevim would fire Appellant, and Appellant would kill Sevim. Appellant asked Halil if he wanted Appellant to be imprisoned for killing his mother after Halil died.

{¶63} Halil told Sevim that Appellant promised Halil that he would continue to own a one-half interest in the apartments, but Sevim did not believe Appellant at first. Halil conceded that he knew he was transferring the one-half ownership interest in the remaining apartments when he signed the deed at the bank, but that Sevim signed the deed under the misapprehension that Appellees would retain a one-half interest.

{¶64} According to Appellant, Sevim was upset that she had not received any of the $10,000.00 per month that Appellant had been paying to Halil. Therefore, Sevim wanted reassurance that, should Halil predecease her, the $10,000.00 per month would be paid to her. Appellant agreed to sign a document promising to pay Sevim $10,000.00 per month for the rest of her life if Halil died before her.

{¶65} On January 18, 2019, Appellant drove his parents to First National Bank in Boardman, Ohio, where Appellees conduct their banking. Despina Koulianos, the branch manager and a notary public, testified that she had previously conducted about 40-50 transactions with Halil and she also knew Sevim.

{¶66} Koulianos testified that Appellees traveled to the bank to have papers notarized. No one was crying, screaming, or yelling. Appellees were calm. She further testified that no one forced Appellees to sign. She conceded, however, that Sevim hardly spoke during the transaction.

{¶67} Koulianos remembered Appellees discussing the $10,000.00 per month payment and notarized the document in which Appellant promised to pay Sevim $10,000.00 per month for her life in the event that Halil predeceased her. Sevim requested a copy of the document. According to Halil, he believed the document memorialized his retention of a one-half interest in the remaining apartments, rather than the $10,000.00 monthly payments.

{¶68} Halil testified that Appellant refused to answer his phone calls after the ownership interest in the remaining apartments was transferred. Halil ultimately

confronted Appellant, and Appellant told him to "use his smarts" and cautioned that Halil would be "into trouble" if he tried to make any claim on the apartments. (*Id.* at 354.)

{¶69} On cross-examination, Halil admitted that the January 18, 2019 deed was signed of his own free will:

Q:     Here's the deed right there for you.

A:     Yeah, I remember this.

Q:     You signed it of your own free will?

A:     Yes, I did.

Q:     You signed it of your own free will, didn't you?

A:     Yes.

Q:     And that's what you told me under oath. You told me the same thing when I took your deposition in September.

A:     In the bank nobody put a gun on me. I signed myself.

(*Id.* at 396.)

{¶70} Halil testified that Sevim was afraid of Appellant. On one occasion, Sevim's automobile had a flat tire, and when Appellant arrived to assist her, she locked herself in the automobile. Initially, Halil testified that Sevim was afraid of both Appellant and Halil. Halil immediately recharacterized his relationship with Sevim, saying that Sevim "respect[ed]" Halil. (Id. at 382-383.)

{¶71} Lovinger testified that Halil, based on his Turkish heritage, considered himself to be the head of the family. Halil desired to be in control and saw himself as being in charge. This led to a lot of arguments and fights between Appellees and they would call Appellant over to their house to settle matters.

{¶72} At her deposition, Sevim denied any threats or abuse by Halil. She testified that they were equal partners, and that Halil exerted no influence over her decisions.

Case No. 20 MA 0012

However, on July 26, 2018, Sevim had an argument with Halil. Appellant was called to the house by Appellees to diffuse the situation and he recorded the conversation between them. Appellant testified that Appellees often called him to their home to diffuse their arguments.

**{¶73}** During this conversation, Sevim stated that Halil had been threatening to kill her as he had done for many years. She says to Halil that he would not have the guts to kill her with a knife, which is why all of the guns in the house had been hidden from him. This evidence was proffered as Defendant's Exhibit H and I.

**{¶74}** Appellant intended to offer the recording as evidence that Sevim was subservient to Halil, and Halil was abusive. Appellant argued that the foregoing evidence controverted the evidence that Sevim was afraid of Appellant and that Appellant was abusive and browbeat Appellees into acting against their will.

**{¶75}** Appellees filed a motion in limine to preclude Appellant from asking any questions about Halil's alleged abuse and control over Sevim. The trial court sustained the motion, excluding all such evidence because its prejudice outweighed its probative value. When Appellant's counsel asked Halil if he had ever threatened his wife, the trial court sustained Appellees' objection and refused to allow the line of questioning to continue.

**{¶76}** Sevim was 93 years of age when she testified at trial. Sevim was agitated and non-responsive during most of her cross-examination. However, at her deposition, Sevim admitted that she signed the deed, but only after receiving the notarized document from Appellant promising to pay her $10,000.00 per month if Halil died. She conceded on cross-examination that she requested a copy of the document at the bank. However, she later testified that "they pushed [her.]" (*Id.* at 584.)

**{¶77}** During direct examination, Sevim testified that she signed the January 18, 2019 deed because she feared that Appellant would hurt her. She explained that "[she] got beaten up from [Appellant] so many times." (*Id.* at 552.) She further testified that her calm demeanor at the bank was a reflection of her culture, rather than her true mental state, because she was raised to maintain her dignity in public without regard to the circumstances.

Case No. 20 MA 0012

**{¶78}** Sevim testified that she did not want to transfer ownership of the remaining apartments to Appellant. She further testified that, if she refused to sign, she would have had to return home with Appellant and Halil and "they [would have] kill[ed] [her]." (*Id.* at 577.)

**{¶79}** Sevil, who resides with Appellees, testified that Appellees had discussed transferring ownership of the remaining apartments to Appellant for years prior to the August 13, 2018 and January 18, 2019 transfers. When asked if there was a plan between Appellees and Appellant in which Appellant would give Appellees $10,000.00 per month in exchange for the apartments, Sevil responded, "That was the agreement." (*Id.* at 623-624.)

**{¶80}** However, Sevil testified that Sevim was scared and crying and Halil "wasn't really himself" on the morning on January 18, 2019. Sevil further testified that she believed that Appellant was pressuring them to transfer ownership of the remaining apartments. (*Id.* at 623.)

**{¶81}** More than a year passed between the execution of the deeds and the initiation of the above-captioned action. During that time, Appellant collected rents, managed the apartments, and provided the monthly payment of $10,000.00 to Halil without issue.

**{¶82}** According to Appellant, Appellees' true motivation for setting aside the deeds was to retaliate against Appellant because he refused to underreport income from the apartments for the 2018 tax year. Appellant testified that the entire Erzurum family knew that Halil had been falsely reporting his income from the apartments on his federal and state tax returns for many years. Appellant argued that Serpil hastily transferred the one-half interest in the remaining apartments back to Appellees for fear of the potential tax liability and the embarrassment of civil litigation should Halil's decades-long history of tax evasion be discovered.

**{¶83}** On cross examination Halil admitted that he had underreported his rental income from the apartments by $173,000 in 2015, $148,500 in 2016 and $68,000 in 2017 (*Id.* at 437.) Halil testified that he was "an angel compared to [Appellant] * * *He got 60 million from the federal government." This appears to be reference to the $6 million default judgment in the qui tam action.

Case No. 20 MA 0012

**{¶84}** Appellant testified that he had been traumatized by his experience in the qui tam action and was determined that the business records would be lawfully maintained. According to Appellant, he accurately reported all rental income and expenses on the 2018 federal and state tax returns for the apartments, and sent Halil a Form 1099 for the $120,000.00 that he had received that year.

**{¶85}** Appellant testified that Halil was outraged when he received the Form 1099 and called Appellant to Halil's house. Halil told Appellant that he wanted the Form 1099 to be $0 and that he wanted to prepare the 2018 tax returns for the apartments. According to Appellant, Halil threatened to "lock up the apartments," "make it a mess," and "figure out a way to lock up the business." (*Id.*)

**{¶86}** On January 29, 2019, Halil met with Appellant to discuss Halil's insistence that the rental income be falsified. Appellant recorded the conversation, and the recording and a transcript of the recording were provided to the jury. Although the recording was admitted into evidence as Defendant's Exhibit K ("DX K"), the transcript was not.

**{¶87}** At approximately a minute and a half into the conversation, Halil states, "you respect law and order more than I do." Halil then requests the rent roll to falsify the business records. (DX K at 1:40.) Halil further objects to having his name on a 1099 after not paying taxes in the past due to his falsification of the rent roll. (*Id.* at 2:15.)

**{¶88}** Appellant tells Halil, "What you are trying to do is bad news. It is fraud. I don't want to have any part of it." (*Id.* at 3:13). Appellant then insists on preparing the taxes in accordance with the law. He offers to write a check to Halil from Appellant's own account to cover Halil's tax bill. (*Id.* at 3:35.) Halil asks Appellant to shave the rent roll and Appellant refuses. (*Id.* at 4:45.) Halil admits to falsifying the rent roll in previous years and continues to insist upon the same practice for the 2018 tax year.

**{¶89}** Next, Halil demands that Appellant falsify the Form 1099 to reflect that Halil received $0 instead of $120,000.00 in 2018, but Appellant refuses. (*Id.* at 6:10.) When Appellant refuses, Halil threatens to file his own income taxes reflecting a different amount than what he had actually received. (*Id.* at 7:20.) Halil then insists that he file the taxes for the apartments, but Appellant, knowing that Halil would fraudulently reduce the revenues, refuses to allow him to do so. (*Id.* at 9:00.)

Case No. 20 MA 0012

**{¶90}** When Appellant refuses to falsify the records for the business, Halil states, "If you don't work with me like father and son handle business, then I will have to take legal action." (*Id.* at 9:40.) Upon realizing that Appellant would not comply with Halil's request to modify the business records, Halil states, "What I'm going to sue you for is I made a mistake giving you the apartments." Halil continues, "If I lose it's all yours, if I take it back then I'll fire you. I don't want you around." (*Id.* at 11:00.) Halil reasons that the business is a family business and Appellant should do as Halil decrees.

**{¶91}** Finally, Halil threatens legal action, stating "[y]ou'll go to jail because you got my apartments * * *because you are now acting like a strange person. That's what I will say." (*Id.* at 14:00.) Halil continues, "Maybe I should have never done this." Appellant responds that Halil "[doesn't] have a choice," referring to the tax returns. Halil replies, "I didn't have to give [the apartments] to you. And I brought you and I gave you a lot of apartments." (*Id.* at 19:20.) He continues "I like you so much I'm almost attached to you and then I put your name on all the apartments and then you're giving me lectures." (*Id.* at 19:40.)

**{¶92}** On February 15, 2019, roughly three weeks after the foregoing conversation occurred, Appellees filed the above-captioned action alleging that Halil executed the August 2018 and January 2019 transfers as a result of undue influence, and that Sevim executed the January 2019 deed under duress. Appellees also asserted a fraud claim based on alleged warranties made by Appellant prior to the execution of the deeds.

**{¶93}** Following a seven-day trial, the jury began deliberations at 2:19 p.m. About an hour and ten minutes later, counsel for the parties were called to the courtroom regarding a question from the jury. At 3:54 p.m., the jury submitted a question to the trial court regarding attorney's fees. Within minutes, the jury returned with signed interrogatories and verdict forms, in favor of Appellees and against Appellant on Appellee's claims for undue influence and duress. The jury found in favor of Appellant on Appellees' fraud claims and Appellees have not appealed the jury's verdict on fraud.

**{¶94}** Appellant filed motions for judgment notwithstanding the verdict and for a new trial arguing that the trial court abused its discretion in admitting evidence that materially prejudiced Appellant. He argued that the allegations of Medicare fraud, his family's move to Turkey, and his bankruptcy petitions were more prejudicial than

probative, and caused irreparable damage to his credibility with the jury. He further argued that the jury's swift deliberations, despite seven days of testimony and the admission of over forty exhibits, demonstrated that jurors were predisposed to ignore the substantial evidence in the record supporting his defense based on his characterization by Appellees as an expatriate criminal and a Medicare cheat. The trial court denied both motions. This timely appeal followed.

## ANALYSIS

**{¶95}** Appellant's first three assignments of error challenge several of the trial court's evidentiary determinations made both before and during trial. They are addressed together for the purpose of judicial economy.

## ASSIGNMENTS OF ERROR I-III

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED, OVER DEFENDANT'S MOTION IN LIMINE AND OBJECTIONS, EVIDENCE AND TESTIMONY REGARDING: (I) A CIVIL QUI TAM ACTION BROUGHT AGAINST DEFENDANT FROM 2001-2004, (II) SPECULATIVE EVIDENCE AS TO WHY DEFENDANT LIVED IN TURKEY FROM 2005-2012, INCLUDING HIS FINANCES WHILE LIVING THERE, AND (III) EVIDENCE REGARDING DEFENDANT'S 2004 AND 2012 BANKRUPTCIES, INCLUDING THE SCHEDULES.**

**{¶96}** "[A] motion in limine, if granted, is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue." *Grubb*, 28 Ohio St.3d at 201–202. "As related to trial, a motion in limine is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." *State v. Charley*, 7th Dist. Belmont No. 05 BE 34, 2007-Ohio-1108, ¶ 49 quoting *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142 (1986).

**{¶97}** In limine rulings are not final; they can be revisited and changed during the course of a trial. *State v. Croom*, 7th Dist. Mahoning No. 12 MA 54, 2013–Ohio–5682, ¶ 173. Failing to lodge a contemporaneous objection to the disputed evidence during trial waives review of the purported error on appeal. *Voleck v. Tennant*, 7th Dist. Belmont No. 18 BE 0036, 2019-Ohio-4230, ¶ 21-23, appeal not allowed, 158 Ohio St.3d 1452, 2020-Ohio-1090, ¶ 21-23 (2020), citing *State v. Hill*, 75 Ohio St.3d 195, 203, 661 N.E.2d 1068 (1996) (the denial of a motion in limine does not preserve a claimed error for review in the absence of the defendant making a contemporaneous objection to the actual admission of the evidence at trial).

**{¶98}** Here, Appellant concedes that trial counsel did not renew his objections by specifically addressing the motion in limine at trial. However, Appellant's trial counsel did assert general objections while Appellees' trial counsel elicited Appellant's testimony about the qui tam action and bankruptcy petitions.

**{¶99}** Decisions granting or denying motions in limine are reviewed for abuse of discretion. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. Likewise, a reviewing court will not disturb a trial court's determination on admissibility of evidence during trial absent an abuse of discretion. *Matter of J.R.P.*, 7th Dist. Mahoning No. 17 MA 0169, 2018-Ohio-3938, 120 N.E.3d 83, ¶ 48, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

**{¶100}** An abuse of discretion is more than an error of law or judgment; it implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Even upon a showing of an abuse of discretion, a reviewing court shall uphold a trial court's evidentiary ruling unless the appellant also establishes that the abuse of discretion caused material prejudice. *PNC Mtge., a Div. of PNC Bank, Natl. Assn. v. Krynicki*, 7th Dist. No. 15 MA 0194, 2017-Ohio-808, 85 N.E.3d 1024, ¶ 14, citing *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, 932 N.E.2d 313, ¶ 38. Ohio Evid. R 103 reads, in relevant part, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Ohio Evid. R. 103(A).

**{¶101}** In formulating the standard of review for improperly-admitted evidence in the criminal context, the Ohio Supreme Court has observed that "while courts may determine prejudice in a number of ways and use language that may differ, they focus on both the impact that the offending evidence had on the verdict and the strength of the remaining evidence." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25. The *Morris* Court continued, "Both the error's impact on the verdict and the weight of the remaining evidence must be considered on appellate review." *Id.*

**{¶102}** Relevant evidence, according to Evid.R. 401, is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Appellant argues that the challenged evidence is too remote in time to be relevant to the validity of the deeds.

**{¶103}** Further, even relevant evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Appellant argues that the prejudice attributable to the introduction into evidence of the 2003 qui tam action, his 2004 and 2012 bankruptcy petitions, and Serpil's testimony regarding Appellant's motive for moving to Turkey, outweighed the probative value of the evidence.

**{¶104}** Prior to trial, Appellant filed a motion in limine seeking to prohibit the introduction of the 2003 qui tam action and the 2004 and 2012 bankruptcy filings. In regards to the 2001 qui tam action, Appellant argued that the civil matter was too far removed to be relevant and did not affect Appellant's medical license. Appellant further argued that the 2012 bankruptcy proceeding discharged all of Appellant's unsecured debt, and he had a good income as a physician and had no financial problems after 2012.

**{¶105}** Appellant argued that the foregoing matters, which, in addition to having occurred long before the execution of the deeds, created the risk of unfair prejudice by painting Appellant as a "deadbeat." Appellant further argued that the evidence was offered for the sole purpose of bolstering Appellees' testimony that Appellant exerted undue influence and duress to compel them to sign the deeds at issue in this appeal. Despite the substantial gap in time between the events at issue in the motion in limine and the execution of the deeds, Appellees' countered that the qui tam action, Appellant's

Case No. 20 MA 0012

life in Turkey from 2005-2012, and the 2004 and 2012 bankruptcy were all relevant because they demonstrated Appellant's financial motive.

**{¶106}** Significantly, Appellees' trial counsel warranted that Appellees had no intention of presenting the 2003 qui tam action to demonstrate fraud or criminal conduct by Appellant, but would raise the issue only to show financial motive. Specifically, Appellees' trial counsel stated, "The only thing I want to talk about is the fact that [Appellant] had a judgment against him. I'm not intending to argue that he committed Medicare fraud." (*Id.* at 43-44.) The trial court overruled Appellant's motion in limine.

**{¶107}** However, during Appellees' opening statement, their trial counsel asserted that Appellant had serious legal problems relating to the 2003 qui tam action "for directing and participating in Medicaid and Medicare fraud." (Trial Tr. at 66.) Appellees' trial counsel further asserted that Appellant fled the United States for Turkey in 2005 because "he was afraid of being arrested if he stayed." (*Id.* at 67.) Despite the fact that the 2003 qui tam action had no effect on Appellant's medical license, Appellees' trial counsel stated that "[Appellant's] medical licenses at that time were inactive and of no value." (*Id.* at 68.)

**{¶108}** Appellant was the first witness called by Appellees. Contrary to the stated purpose of Appellees' trial counsel for offering the 2003 qui tam action into evidence, he asked Appellant, "[y]ou conspired with the other defendants to defraud the United States? Isn't that what [the allegations in the qui tam action] says?" (*Id.* at 142.) The trial court sustained a hearsay objection with respect to the allegations in the qui tam complaint, but overruled Appellant's objection to the general line of questioning, including questions suggesting that Appellant defrauded the government.

**{¶109}** Appellees' trial counsel asked Appellant, "You knew that you were – the federal government was investigating you for criminal conduct associated with the allegations of the Medicare billing case, correct?" In response, Appellant speculated that "[t]here's always a criminal investigation where there's a civil claim. I don't – nothing ever came of that." (Trial Tr. at 140-141).

**{¶110}** Appellees' trial counsel then accused Appellant of returning to the United States in 2012 because the statute of limitations had run on the federal government's ability to charge him for criminal conduct. Appellees' trial counsel inquired, "Did you tell your sister Serpil that you came back from Turkey because enough time had passed that

Case No. 20 MA 0012

you could no longer be prosecuted for Medicare fraud?" (*Id.* at 150.) However, an individual cannot avoid prosecution by fleeing the country because it tolls any statute of limitations. See 18 U.S.C. §3290 ("No statute of limitations shall extend to any person fleeing from justice.").

{¶111} Having reviewed the trial transcript and the exhibits admitted at trial, we find that two diametrically-opposed narratives were offered at trial. Appellees and their witnesses described Appellant as the scheming black sheep of an otherwise accomplished and wealthy family, who badgered and threatened his isolated and mentally-impaired elderly parents to transfer ownership of the apartments. Appellant and his witnesses, on the other hand, described Appellant as the dutiful oldest son of parents who reneged on their promise to transfer ownership of the apartments, in order to punish him for acting in accord with state and federal law. Because there is compelling evidence in the record to support both narratives, the verdicts turned exclusively on the juror's credibility determinations.

{¶112} With respect to the challenged evidence, Appellees argue that "[f]or the jury to grasp why [Appellant] behaved the way he did toward his parents, and why his parents ultimately succumbed to his incessant pressure to deed over their apartment buildings to him, the jury needed to her [sic] the **entire** story – not just [Appellant's] false and self-serving narrative." (emphasis in original)(Appellees' Brf., p. 8.) Appellees further argue that 404(B) permits evidence of other wrongs to be admitted to show proof of motive, opportunity, intent, and plan to acquire the apartments.

{¶113} However, Appellant's reversal of fortune, which was the stated purpose of Appellees in admitting the 2003 qui tam action and his 2004 bankruptcy, occurred roughly fifteen years prior to the execution of the deeds at issue. Appellant's reason for moving to Turkey was likewise too far removed to be relevant to the validity of the deeds.

{¶114} Of equal concern, the 2003 qui tam action was never tried and ultimately settled for a fraction of the $6 million default judgment, however, it is unlikely that members of the jury appreciated the procedural significance of a default judgment. Likewise, Serpil's testimony that Appellant moved to Turkey for the express purpose of avoiding criminal charges cast Appellant as an individual seeking to evade responsibility for criminal conduct, when, in fact, no evidence of a criminal investigation or criminal

Case No. 20 MA 0012

conduct were offered at trial, other than Appellant's unsupported speculation that a criminal investigation always follows an FCA action.

**{¶115}** Despite the fact that Appellant's unsecured debts were discharged in the 2012 bankruptcy, both of his bankruptcy petitions were admitted into evidence  Because Appellant was no longer encumbered by the debt when the deeds were executed, the admission of the bankruptcy petitions, which state debt in the tens of millions of dollars, and the testimony surrounding them, served no other purpose than to solidify Appellees' characterization of Appellant as a man who flouts the law.

**{¶116}** Finally, Appellees' counsel characterized Appellant as a criminal who defrauded the federal government and fled from prosecution in his opening statement. As a consequence, the jurors, as the sole arbiters of the credibility of the witnesses, were predisposed to distrust Appellant's testimony.  The testimony of Appellant, who was the first witness to testify, was likewise peppered with unsubstantiated accusations of fraud and speculation of a federal criminal investigation, which, based on the record in this case, never occurred.

**{¶117}** Because the foregoing evidence was both irrelevant and prejudicial, we find that the trial court abused its discretion when it admitted the challenged evidence. Improperly-admitted evidence must result in material prejudice in order to overturn a verdict and remand a matter for a new trial. Although the term "material prejudice" has not been defined in the civil context, the Ohio Supreme Court in *Morris* generally instructs appellate courts to consider "the impact that the offending evidence had on the verdict and the strength of the remaining evidence" in order to determine whether a substantial right has been affected. *Morris*, *supra*, ¶ 25.

**{¶118}** We find that the prejudicial impact of the 2003 qui tam action, the 2004 and 2012 bankruptcies, and Serpil's testimony regarding Appellant's reason for moving to Turkey was substantial, insofar as the judgment in the 2003 qui tam action had been satisfied, Appellant's unsecured debts had been discharged, and there was no evidence that Appellant was the subject of a criminal investigation, or that he could successfully assert a statute of limitations defense to the non-existent criminal charges.  Further, based on the remaining evidence in the record, we cannot conclude that the verdicts would be the same in the absence of the improperly-admitted evidence.

{¶119} In an appeal of a jury verdict, we must defer to the credibility determinations of the trier of fact. Here, we find that the material prejudice occurred due to the influence of the improperly-admitted evidence on the jurors' credibility determinations. As we previously observed, there exists compelling evidence in the record supporting the arguments of both sides. As Appellant's credibility was irreparably damaged by the admission of the challenged evidence, we find that Appellant suffered material prejudice, and that his substantial right to a fair trial was affected. Accordingly, we find that Appellant's first three assignments of error have merit.

## ASSIGNMENT OF ERROR IV

**THE TRIAL COURT ABUSED ITS DISCRETION AND/OR COMMITTED PLAIN ERROR WHEN IT PERMITTED THE OPINION OF DR. LOVINGER, WHO TESTIFIED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY REGARDING A GERIATRIC PATIENT WHEN HE WAS NOT A MEDICAL DOCTOR AND DID NOT SPECIALIZE IN GERIATRICS.**

## ASSIGNMENT OF ERROR V

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PRECLUDED DEFENDANT FROM INTRODUCING EVIDENCE DEMONSTRATING THAT PLAINTIFF, SEVIM ERZURUM, WAS SUBJECT TO UNDUE INFLUENCE, THREATS AND FEAR FROM HER HUSBAND, HALIL ERZURUM, BUT FREELY ADMITTED EVIDENCE SUGGESTING THAT SHE WAS IN FEAR FROM HER SON, APPELLANT ERZURUM.**

## ASSIGNMENT OF ERROR VI

**THE DECISION OF THE JURY, WHICH WAS CLOUDED BY THE VOLUMINOUS ADMISSION OF IRRELEVANT, COLLATERAL, UNFAIRLY PREJUDICIAL AND SPECULATIVE EVIDENCE, WAS AGAINST THE SUFFICIENCY OF THE EVIDENCE.**

Case No. 20 MA 0012

## ASSIGNMENT OF ERROR VII

**THE DECISION OF THE JURY, WHICH WAS CLOUDED BY THE VOLUMINOUS ADMISSION OF IRRELEVANT, COLLATERAL, UNFAIRLY PREJUDICIAL AND SPECULATIVE EVIDENCE, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR VIII

**THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST FOR A JUDGMENT NOTWITHSTANDING THE VERDICT AND MOTION FOR A NEW TRIAL DUE TO THE ADMISSION OF INADMISSIBLE EVIDENCE, THE LACK OF EVIDENCE SUPPORTING THE JURY'S VERDICT AND THE EVIDENCE SUPPORTING A FINDING THAT NO UNDUE INFLUENCE OR DURESS OCCURRED AT THE TIME THE DEEDS WERE SIGNED.**

## ASSIGNMENT OF ERROR IX

**THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST FOR A JUDGMENT NOTWITHSTANDING THE VERDICT AND MOTION FOR A NEW TRIAL BECAUSE THE JURY FAILED TO SUFFICIENTLY DELIBERATE AND REVIEW THE EVIDENCE WHEN IT RENDERED A DECISION IN LESS TIME THAN IT COULD POSSIBLY TAKE TO EVEN REVIEW THE VOLUMINOUS EXHIBITS.**

{¶120} Having concluded that the trial court abused its discretion in admitting testimony and evidence regarding the 2003 qui tam action, the 2004 and 2012 bankruptcies, and Appellant's alleged reason for moving to and returning from Turkey, and that Appellant suffered material prejudice, we find the remaining assignments of error are moot.

Case No. 20 MA 0012

**CONCLUSION**

{¶121}  Having reviewed the testimony and exhibits offered at trial, we find that the admission of the evidence challenged in the first three assignments of error was an abuse of discretion by the trial court and that Appellant suffered material prejudice as a result of its admission.  Because we find that the verdicts turned on the credibility of the witnesses, and the offending evidence directly impacted the jurors' credibility determinations, the judgment entry of the trial court is reversed and vacated and this matter is remanded for a new trial pursuant to this opinion and in accordance to law.

Donofrio, P.J., concurs.

Robb, J., concurs.

---

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio is reversed and vacated and this matter is remanded for a new trial pursuant to this opinion and in accordance to law. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**